1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DARRYL D. JENKINS,

11          Plaintiff,                    No. CIV S-09-1084 GGH

12      vs.

13
     MICHAEL J. ASTRUE,
14   Commission of Social Security,

15          Defendant.                    ORDER

16   _____/

17   _Introduction and Summary_

18          Plaintiff, a presently fifty-six (almost 57) year old applicant[1] for Supplemental

19   Security Income (Title XVI), suffers from a combination of spine and mental/emotional ailments.

20   After careful review of the well-briefed positions, the court concludes that the case must be

21   remanded for further work-up of the vocational expert.

22   \\\\\

23
     _____
24          [1] According to the ALJ, plaintiff was born in March of 1954. Tr. 23.  For unexplained
     reasons, the ALJ put plaintiff's age at fifty when writing this decision in 2008.  Plaintiff was
     fifty-four at that time.  This is not the first time that the undersigned has encountered such an
25   error in an ALJ's decision, and age can make a difference.  However, when the ALJ posed the
     hypothetical to the VE he did use the correct age.  Tr. 58.  Thus, the error in the ALJ's decision
26   appears to have been a harmless clerical error.

                                            1

1    *Facts*

2              The ALJ's formal findings are as follows:

3              1.   The claimant has not engaged in substantial gainful activity
               since January 18, 2006, the application date (20 CFR 416.920(b)
4              and 416.971 *et seq.*).
               2.   The claimanat has the following severe impairments: lumbar
5              degenerative disc disease, mild degenerative cervical changes,
               adjustment Disorder with Anxiety and Depressed Moods, alcohol
6              Dependence in remission with rule out substance abuse, NOS,
               tension headaches, left great toe degenerative changes, and right
7              popliteal knee cyst (20 CFR 416.920(c)).

8    *Issues*

9              1.   Whether the ALJ improperly failed to accord proper weight to the treating

10   physician's opinion;

11             2.   Whether the ALJ's rejection of mental limitations posed by a State Agency

12   physician was appropriate;[2]

13             3.   Whether the ALJ properly rejected the testimony of plaintiff and third party

14   witness concerning plaintiff's limitations;

15             4.   Whether the ALJ relied on the vocational expert (VE) response to an

16   improperly formulated  hypothetical;

17             5.   Whether the jobs which the VE identified as being able to be performed by

18   plaintiff were consistent with the Dictionary of Occupational Titles.

19             The ALJ identified an irrelevant/ spurious "severe impairment" – "alcohol

20   Dependence in remission with rule out substance abuse."  The identification is irrelevant in that

21   "alcohol dependence in remission," cannot by definition have a *present* limitation on plaintiff's

22   ability to work because it is in remission.  The identified impairment is also spurious in that

23   the ALJ does not analyze "rule out substance abuse" (overuse of prescription drugs) as an

24   impairment at all pursuant to the required analysis set forth in Bustamante v. Massanari, 262 F.3d

25   _____

26             [2]  Plaintiff combines issues 1 and 2, but they clearly encompass different standards of
     review.

949, 955 (9th Cir. 2001), but rather utilizes the alleged *possible* substance abuse as an adverse factor to plaintiff's credibility.  The undersigned will not consider this asserted non-ailment as either subject to the sequential analysis pursuant to <u>Bustamante</u>, nor will the undersigned consider it adversely vis-a-vis plaintiff's credibility.

*<u>Discussion</u>*

    A.  <u>Legal Standards</u>

Although review of Social Security[3] administrative law judge decisions are supposed to be affirmed if substantial evidence supports the findings, the undersigned will not set forth the usual "substantial evidence" standard, as that standard has been often replaced in case law with finely tuned standards which apply to discrete issues in Social Security practice, and define the standard in terms which do not include the phrase: "substantial evidence."  The precise, applicable standard will be given in each section.  However, it is useful to set forth the sequential analysis parameters which define where an error may occur in a Social Security adjudication.

Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq.  Supplemental Security Income is paid to disabled persons with low income.  42 U.S.C. § 1382 et seq.  Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ."  42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A parallel five-step sequential evaluation governs eligibility for benefits under both programs. <u>See</u> 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987).  The following summarizes the sequential evaluation:

> Step one:  Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed

---

   [3] "Social Security" will be used as a shorthand for the benefits at issue here – Supplemental Security Income, the needs based half of federal disability benefits law under the purview of the Social Security Administration.

to step two.

        Step two:  Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.

        Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.

        Step four:  Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.

        Step five:  Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

        The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5.  The Commissioner bears the burden if the sequential evaluation process proceeds to step five.  Id.

        B.  Whether the ALJ's Rejection of the Treating Physician Was Proper

        The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals.  Holohan v. Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).[4]  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual.  Id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).

        To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record;

---

[4] The regulations differentiate between opinions from "acceptable medical sources" and "other sources."  See 20 C.F.R. §§ 404.1513 (a),(e); 416.913 (a), (e).  For example, licensed psychologists are considered "acceptable medical sources," and social workers are considered "other sources."  Id.  Medical opinions from "acceptable medical sources," have the same status when assessing weight.  See 20 C.F.R. §§ 404.1527 (a)(2), (d); 416.927 (a)(2), (d).  No specific regulations exist  for weighing opinions from "other sources."  Opinions from "other sources" accordingly are given less weight than opinions from "acceptable medical sources."

and (2) clinical findings support the opinions.  An ALJ may reject an *uncontradicted* opinion of

a treating or examining medical professional only for *"clear and convincing"* reasons.  Lester, 81

F.3d at 831.  In contrast, a *contradicted* opinion of a treating or examining professional may be

rejected for *"specific and legitimate"* reasons.  Lester, 81 F.3d at 830.  While a treating

professional's opinion generally is accorded superior weight, if it is contradicted by a supported

examining professional's opinion (supported by different independent clinical findings), the ALJ

may resolve the conflict.  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing

Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).  The regulations require the ALJ to

weigh the contradicted treating physician opinion, Edlund v. Massanari, 253 F.3d 1152 (9th Cir.

2001),[5] except that the ALJ in any event need not give it any weight if it is conclusory and

supported by minimal clinical findings.  Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir.1999)

(treating physician's conclusory, minimally supported opinion rejected); see also Magallanes,

881 F.2d at 751.  The opinion of a non-examining professional, without other evidence, is

insufficient to reject the opinion of a treating or examining professional.  Lester, 81 F.3d at 831.

> Finally, as plaintiff's counsel points out,
>
> When an examining physician relies on the same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions of the examining physician are not "substantial evidence." As we explained in *Murray*, "In this case, ... the findings of the non-treating physician were the same as those of the treating physician. It was his conclusions that differed.... If the ALJ wishes to disregard the opinion of the treating physician, he or she must make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." 722 F.2d at 501-02 (emphases in original). By contrast, when an examining physician provides "independent clinical findings that differ from the findings of the treating physician," such findings are "substantial evidence."

Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007).

---

[5]  The factors include: (1) length of the treatment relationship; (2) frequency of
examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis;
(5) consistency; (6) specialization. 20 C.F.R. § 404.1527

1    In this case, plaintiff's long time "back" doctor was Dr. Neuschatz, but before this

2    treatment, plaintiff had quite a history with back problems.  In 1983, plaintiff underwent a

3    lumbar laminectomy, as well as a tenotomy on his neck.[6]

4    This patient had extensive surgery on February 12, 1983.  The
     lumbar myelogram revealed an extra-dural defect at three different
5    levels.  A rather extensive central disc protrusion was present at the
     third disc L#-4.  At surgery a very extensive central disc rupture
6    was present, but projecting laterally toward the right.  Disc rupture
     and protrusion were also present at the fourth disc L4-5, and at the
7    fifth disc L5-S1, all on the right side.

8    The lumbar 3 disc was centrally placed and extremely large.  All
     three ruptured discs were exposed and the injured pulp removed
9    from the third, fourth and fifth discs.

10   Tr. 232.  See also, Tr. 245-246.

11   In 1999, plaintiff slipped while employed at a school resulting in further back injury.  Tr. 250-

12   278.  Plaintiff suffered on and off from this injury and underwent at least two nerve root

13   blockades, the last one in 2003.  Tr. 304, 332.

14   Commencing in 2003, and continuing through 2008, petitioner was regularly seen

15   by Dr. Neuschatz for back and neck chronic pain.  Tr.339-376, 482-514, 582-597.  There is no

16   point to exhaustively repeating the findings of every visit.  Suffice it to say that on nearly every

17   visit, plaintiff's chronic lower back pain was observed, and at times, neck pain.  Typical of these

18   entries were those of October 23, 2003: "3. Chronic back pain...," Tr. 367; September 9, 2004:

19   Right knee strain.  Chronic back pain...," Tr. 359; May 20, 2005: "Cervical strain, superimposed

20   on chronic neck and back pain....Tr. 351; May 9, 2006: "Chronic back pain.  Chronic anxiety....;"

21   Tr. 493; August 31, 2007: ..."Chronic back pain...anxiety," Tr. 589; ; Feb. 25, 2008: "(4) Chronic

22   back pain; "chronic anxiety," Tr. 582.   For all of the pertinent time period, Dr. Neuschatz

23   renewed plaintiff's pain medication prescriptions, primarily Vicodin and Soma.  The record

24

25       [6]  According to Wikipedia, a tenotomy is the division (cutting) of a tendon; a
     laminectomy involves an operation, at times quite invasive, to remove the lamina and proximate
26   tissues/ligaments in order to reduce pressure on the spine or nerve roots caused by spinal
     stenosis.

1  reflects that plaintiff's pain symptoms waxed and waned, but were primarily "stable," Tr. 593,

2  whatever degree "stable" was.  The record also reflects that plaintiff was advised to perform

3  exercise to alleviate the pain, sometimes "lots" of exercise.  Tr. 593.  The exercise was primarily

4  stretching type exercise, but also some walking.  The record reflects that plaintiff also rode his

5  bike, at times with untoward consequences.

6         As the ALJ found, and as to which there is no dispute, the major source for

7  plaintiff's pain was "advanced lumbar degenerative lumbar disc disease."  See e.g., radiological

8  report of August 7, 2006, Tr. 515.  With this record, Dr. Neuschatz determined on a residual

9  functional capacity form that plaintiff had a principal diagnosis of back pain and a secondary

10 cervical spine problem.  Tr. 539.  He ascribed limits of lifting from 1-20 pounds "occasionally,"

11 but not lifting in excess of that amount.  Tr. 540.  Certain repetitive movements were limited to

12 occasional.   Of importance to this case, he also imposed limits of 4 hours walking in a day, with

13 rest interruptions at 1 hour intervals, and four hours sitting in a day with the same 1 hour

14 intervals.  Tr. 539.  Dr. Neuschatz rated plaintiff's pain as chronically a 6, and at times a 9, on a

15 ten point scale.  Tr. 540.

16        The state agency doctor (Dr. Tambellini), performing only a record review up to

17 the time of his RFC opinion in 2006, found that plaintiff could lift 10 pounds frequently, and 20

18 pounds occasionally, only a bit more than that found by Dr. Neuschatz in terms of the frequency

19 of very light lifting.   However, Dr. Tambellini found plaintiff able to walk six hours in a day,

20 apparently without interruption, and could sit for the same time without interruption.

21        The ALJ accepted Dr. Tambellini's opinion and gave minimal weight to Dr.

22 Neuschatz.  His reasoning is set forth here:

23         As far as the opinion evidence, the undersigned gives greatest
           weight to the opinions of the State agency physician Dr. Tambellini
24         with respect to the claimant's physical limitations.  Dr. Tambellini
           opined the claimant is able to lift/carry 20 pounds occasionally and
25         ten pounds frequently; sit for six of eight hours, stand/walk for six
           of eight hours; balance frequently; occasionally climb ramps/stairs,
26         stoop, kneel, crouch or crawl; and no climbing ladders, ropes or

                                                    7

scaffolds or concentrated exposure to work hazards and the undersigned gives this assessment greatest weight. His opinion is supported by x-ray evidence of degenerative changes consisting of mild scoliosis, advanced lumbar degenerative disc disease, good range of shoulder motion with minimal tenderness, and right knee cyst but with no significant objective findings, including the treating records that note minimal findings such as negative straight leg raise, a little decreased of range of motion, motor and DTR intact to lower extremities, and a little bit of tenderness in his back, degenerative changes in his left great toe but with minimal additional findings, and headaches improved with treatment.

The undersigned has also considered the opinion of Dr. Neuschatz who opined in October 2007 that the claimant has back and neck pain per patient's report that limits him to stand/walk for one hour without interruption for a total of four hours; sit for one hour without interruption for a total of four hours; sustain work activity for only four hours per day; occasionally bend, climb, balance, stoop, crouch, crawl or kneel, occasionally lift/carry up to 20 pounds; occasionally reach, handle, or finger; and needs to lie down per patient report. Although Dr. Neuschatz is a treating source, the undersigned gives this statement minimal weight for multiple reasons. In the statement, Dr. Neuschatz notes no objective clinical signs and findings and states it is based on the patient report rather than identified signs and findings. The claimant does have x-ray evidence of mild scoliosis and advanced lumbar degenerative disc disease. However, although he has degenerative changes, the treating records note minimal findings such as negative straight leg raise, a little decreased of range of motion, motor and DTR intact to lower extremities, and a little bit of tenderness in his back. The claimant has complaints of knee pain and of being "100 percent disabled" yet Dr. Neuschatz notes that he rides a bike which would seem to be inconsistent with the claimant's self assessment. Examination of his knees revealed minimal findings with a little bit of tenderness but minimal effusion or decreased range of motion. He has evidence of degenerative changes in his big toes but has not required any treatment. Another notation indicates the claimant had done "some lifting and painting and little bit of work" again indicating he is more active than he testified. The claimant also has intermittent shoulder complaints but again with minimal findings on examination. The claimant has also been seen for intermittent headaches and has made different allegations regarding their history. He had normal findings and was treated with medication. The only significant findings was several episodes of altered consciousness secondary to prescription pain medication overuse. Dr. Neuschatz has provided no treatment other than medication refills and even then the records suggest the claimant may have drug-seeking behavior. Dr. Neuschatz has not thought his condition to be so severe that he requested tests other than one x-ray and has not made referrals for further evaluation. In addition,

> the claimant's current treating source, Dr. Roth notes that pain
> medication works for his complaints of pain in his back and knees.
> Dr. Roth noted no significant complaints related to his shoulders,
> back, neck, toes, headaches or hypertension.

Tr. 21-22.

First, it was quintessential <u>Orn v. Astrue</u> error for the ALJ to reject Dr. Neuschatz in favor of Dr. Tambellini.  The state agency doctor did not rely on independent clinical findings; he relied on the same record as Dr. Neuschatz (the bulk of the record was Dr. Neuschatz's findings).  Indeed, Dr. Tambellini, having given his opinion in 2006, had less of a record on which to opine than did the long term treating physician who gave his RFC opinion in 2007.  In addition, there was no disagreement on the medical findings; only the conclusions as to the medical limitations derived from that record differed.

Secondly, the undersigned supposes that even without considering Dr. Tambellini's opinion, the ALJ could have rejected the opinion of the treating physician, if it were so patently in error, although this would have left the ALJ without an RFC medical assessment. So, the undersigned looks to the specificity of reasons for rejecting the Neuschatz opinion and the legitimacy of those reasons.  The undersigned cannot fault the specificity of the ALJ's rejection, aka minimal consideration, of Dr. Neuschatz' RFC assessment.  However, the undersigned faults the legitimacy of those reasons.

First and foremost, the ALJ repeated the undisputed diagnosis of severe lumbar disc degeneration when discussing the doctors' opinions, but made no assessment of the type of effects such a condition would probably have exacted on plaintiff.  Was the severity of the degeneration something one might expect to produce a high level of pain, or would it be merely a trifling annoyance?  The medical literature suggests the former.

> In most patients the mere presence of degenerative discs is not a
> problem leading to pain, neurological compression, or other
> symptoms.  However, in a certain number of patients, the disc
> degeneration leads to spinal "instability," the condition in which
> the spine is unable to bear the patient's weight or perform its

normal functions without disabling pain.

*Conditions and Disorders, Degenerative Disc Disease (Cervical and Lumbar)*, UCLA Spine Center, spinecenter.ucla.edu/body.

Plaintiff had suffered chronic pain for at least five years, and had been prescribed a strong narcotic type drug for the chronic pain.  It simply cannot be that plaintiff's condition amounted to no more than a trifling annoyance when it came to standing and sitting for lengthy periods of time.  Moreover:

> Lumbar disc degenerative disorder can be associated with low back pain.  It would typically be *weight-bearing* type of back pain *with severe pain on sitting.  Standing for any length of time and walking can also be painful, as are bending and lifting.*

Id.(emphasis added)[7]

It is true that the prescribed Vicodin could be expected to mask the pain to some degree (with whatever side effects), but this type of assessment is particularly something in the knowledge of the treating physician when giving his walking and sitting assessment.

Secondly, the ALJ was not fair in his rejection, in light of the overall history of the Neuschatz treatment, when he picked a fact or two from the record out of context, or completely misread the record.  The ALJ stated that Dr. Neuschatz "notes no objective clinical signs and findings and states it is based on the patient report rather than identified signs and findings."  Of course, the diagnosis was based to some extent on the patient's years long reports of pain, but Dr. Neuschatz would also have been privy to the undisputed radiological evidence and historical evidence of plaintiff's chronic condition.  With the exception of a patient reported requirement that he had to lie down three times a day, and for which there was nothing in the record to support that limitation, see infra, it was certainly unfair to find that Dr. Neuschatz relied on none

---

[7] There is always potential danger in a layperson, such as the undersigned, to extrapolate from medical literature, but this common sense extrapolation is better than the layperson ALJ's unexplained ignoring of the medical impact plaintiff's condition would likely demonstrate.

1   of the objective evidence of plaintiff's undisputed back ailments, but instead relied only on

2   patient reports over the years.  In addition, the ALJ notes "minimal findings" which *he* believes

3   should be present for this advanced lumbar disc disease for it to be disabling, such as "[positive]

4   straight leg raise" and "[significant] decreased range of motion," but according to the literature,

5   these tests would not necessarily be relevant to the bio-physics causing the type of pain of a

6   lumbar condition, i.e., prolonged weight bearing and sitting.  Certainly these types of tests are

7   used to rule out particular problems, but the "minimal findings" for unrelated possible conditions

8   do not mean that plaintiff's condition is minimal.  The ALJ made medical assumptions which are

9   not warranted.  Moreover, sitting for short periods of time, perhaps even on an occasional bike

10  ride, is not the problem – it is sitting for extended periods of time without interruption.  Finally,

11  if one has to make medical assumptions from the record, the treating physician is in the best

12  place, both from an expertise and observance standpoint, to make the appropriate assumptions

13  and draw the appropriate inferences.

14          Further, without any inquiry directed to Dr. Neuschatz, the ALJ believed that the

15  doctor's inaction in ordering more radiological tests or aggressive treatment counteracted his

16  RFC assessment.  There are many possible reasons for not ordering more radiological tests, one

17  being that the condition was well established by the record, including multiple radiological tests

18  over the years, and further repetitive tests were unnecessary.  In addition, the lack of severity of a

19  condition is a possible reason why further evaluation/treatment is not undertaken, but is

20  completely speculative, as cost, individual appropriateness and other reasons may contraindicate

21  such further treatment.  The ALJ never specified what other evaluation or treatment he thought

22  required in order that plaintiff's condition be serious and why.

23          The ALJ further used plaintiff's most recent treating source, Dr. Roth, [8] as one

24  basis to reject the Neuschatz opinion observing that Dr. Roth stated that plaintiff's pain

25

26          [8] Plaintiff's limited public medical insurance was no longer accepted by Dr. Neuschatz.

1  medication "worked," and that Dr. Roth noted no complaints about plaintiff's various conditions,

2  including his back.  The undersigned finds that Dr. Roth's statements cannot be used to reject the

3  Neuschatz opinion.  Dr. Roth took over plaintiff's case when for some reason, plaintiff's state

4  insurance (apparently Medi-Cal) would no longer be accepted by Dr. Neuschatz.  The first Roth

5  entry was merely a review and quick summary of the previous records, and do not stand as Dr.

6  Roth's examination findings for plaintiff.  Tr. 580-81.  Nothing in that opinion detracts from the

7  Neuschatz opinion.  The second Roth entry in which the doctor reflected that the Vicodin had

8  been "apparently []helpful," is of little significance.  Since plaintiff has been prescribed this

9  medication for so long, there is little doubt that it was helpful in some sense.  But what does this

10  mean?  Helpful to the point where all pain was gone?  Helpful to the point where only a bit of the

11  pain was so mitigated that plaintiff's condition could not have a significant impact on work

12  activities?  Or somewhere in between?  The fact that medication prescribed by a doctor might be

13  "helpful" does little to cast aspersions on a doctor's functional capacity assessment.

14         This is not the type of case in which a one or two-time "treating" physician

15  appears to be advocating for a patient.  Rather, Dr. Neuschatz' treatment extended over a long

16  period of time in which he had ample opportunity to observe this particular patient.  Neuschatz

17  did not opine that plaintiff was essentially in a  a vegetative state, as one might expect from an

18  advocate, but he did impose essentially half day limitations on plaintiff's ability to perform

19  sustained work, only somewhat more in terms of limitation than imposed by Dr. Tambelllini.

20  The ALJ's rejection of the Neuschatz opinion was not in accordance with Ninth Circuit

21  precedent.

22         C. Rejection of the State Agency Mental Assessment

23         Dr. Gross was the Social Security reviewing doctor who assessed the evidence of

24  record with respect to plaintiff's mental limitations.  His assessment appears at Tr. 432-435.  The

25  form encompasses a check list box of summary conclusions and a section for any remarks

26  elaborating on the conclusions.  Dr. Gross would have been primarily reviewing the consultative

1   examiners who saw plaintiff on one occasion as well as the remarks of treating physicians such

2   as Dr. Neuschatz.  Plaintiff objects to the fact that the ALJ did not accept all of Dr. Gross'

3   opinions.  The ALJ did not include "moderate" limitations found – maintain attendance, sustain

4   an ordinary routine without special supervision, the ability to work in proximity to other without

5   being distracted, and others.  The ALJ, in his operative hypothetical, found only that plaintiff

6   could perform one and two step tasks on account of moderate limitations in maintaining

7   concentration, perseverance and pace.  Tr. 59.

8           Obviously, Dr. Gross is not a treating physician, and the treating physicians'

9   standards are not applicable to this issue.  Nor was Dr. Gross and examining physician.  Rather, it

10  is within the ALJ's province to review non-examining physicians in light of the evidence, and his

11  choice in this regard will not be overturned unless it approaches an arbitrary determination.

12          The ALJ refused to find all of the limitations found by Dr. Gross, in part, because

13  the first part of the mental assessment (the summary conclusions) were mere "guidelines," and

14  that the "elaborations" were the real opinion.  The ALJ's finding in this regard was arbitrary.

15  The form says nothing about "guidelines," and as argued by plaintiff, the summary conclusions

16  are indeed the medical findings of the reviewing physician.  See Tr. 432.  This is in keeping with

17  the plain language of the form.  "Elaborations" on the conclusions are just that and should be

18  understood in light of the plain meaning of that word, i.e., further explanations.

19          However, the ALJ chose to rely on the consulting examiner, Dr. Azevedo who did

20  observe plaintiff on March 14, 2006.  Although the records provided to Dr. Azevedo were sparse,

21  they sufficiently contained the exemplar visits with personnel at the Del Norte Clinic which

22  reflected plaintiff's anxiety disorder.  This consulting examiner found only moderate or mild

23  limitations in the ability to maintain concentration throughout a workday or workweek.  Since the

24  examining physician stands in a higher analytical place than the non-examining physician, the

25  ALJ's decision to rely on Dr. Azevedo was not in any way arbitrary.  It follows that framing a

26  hypothetical utilizing the Azevedo findings was not error.

1    D.  Whether the ALJ Properly Rejected the Testimony of Plaintiff and Third Party

2    Witness Concerning Plaintiff's Limitations

3            Looking ahead for a moment to the next issue (the questions posed to the

4    vocational expert), plaintiff's credibility is important because the question relied upon by

5    plaintiff as dispositive in this case included a limitation that plaintiff lie down three times a day

6    during the workday.  Tr. 65.  Plaintiff phrases the VE issue as simply an adoption of the RFC set

7    forth by Dr. Neuschatz, but it is not.  The "lie down" requirement was one not "found" by Dr.

8    Neuschatz as were his other findings, but was merely a repetition of a statement that plaintiff

9    made at some unknown time and for some unknown duration.  Tr. 540.  Plaintiff repeated that

10   limitation in his testimony.  Tr. 47-48.  In his entire treatment of plaintiff, Dr. Neuschatz had

11   never recommended to plaintiff that he needed to lie down three times a day – at least the record

12   shows no such advice.  Indeed, Dr. Neuschatz continuously recommended that plaintiff engage in

13   exercise to aid his condition.  See e.g., Tr. 348, 352, 354, 358.  Nor can the court ever find an

14   instance where plaintiff reported that he had to lie down three times a day because of his various

15   conditions.  And plaintiff had so many contacts with Dr. Neuschatz, one would have expected to

16   have found that reported limitation – at least once.  Certainly, the records reflect many other

17   reports by plaintiff.  Thus, plaintiff's credibility for that statement is on the line.

18           Generally, the ALJ found plaintiff "not fully credible," Tr. 22, and that his alleged

19   symptoms "would not preclude him from performing work at the above stated residual functional

20   capacity level."  Tr. 23.  Presumably, that means as well that the "lie down" requirement was

21   rejected by the ALJ as well as he chose to rely on the SA doctor's assessment which did not

22   include this limitation.

23           Plaintiff cites Lingenfelter v. Astrue, 504 F.3d 1023, 1035-1036 (9th Cir. 2007),

24   as setting forth the credibility assessment standards, and that recent case is as good as any to use

25   herein:

26           To determine whether a claimant's testimony regarding subjective

14

pain or symptoms is credible, an ALJ must engage in a two-step
analysis. First, the ALJ must determine whether the claimant has
presented objective medical evidence of an underlying impairment
"which could reasonably be expected to produce the pain or other
symptoms alleged." *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th
Cir.1991) (en banc) (internal quotation marks omitted). The
claimant, however, "need not show that her impairment could
reasonably be expected to cause the severity of the symptom she
has alleged; she need only show that it could reasonably have
caused some degree of the symptom." *Smolen v. Chater*, 80 F.3d
1273, 1282 (9th Cir.1996). "Thus, the ALJ may not reject
subjective symptom testimony ... simply because there is no
showing that the impairment can reasonably produce the degree of
symptom alleged." *Id.*; see also *Reddick*, 157 F.3d at 722 ("[T]he
Commissioner may not discredit the claimant's testimony as to the
severity of symptoms merely because they are unsupported by
objective medical evidence.").

Second, if the claimant meets this first test, and there is no
evidence of malingering, "the ALJ can reject the claimant's
testimony about the severity of her symptoms only by offering
specific, clear and convincing reasons for doing so." *Smolen*, 80
F.3d at 1281; see also *Robbins*, 466 F.3d at 883 ("[U]nless an ALJ
makes a finding of malingering based on affirmative evidence
thereof, he or she may only find an applicant not credible by
making specific findings as to credibility and stating clear and
convincing reasons for each.").

The ALJ found plaintiff not "fully credible."  The undersigned understands this

finding as a rejection of the severity of symptoms alleged by plaintiff even though the ALJ

accepted that plaintiff has some degree of symptomatology.  In his specific findings regarding

physical limitations, the ALJ found:

No significant atrophy, neurological deficits, radicular pain,
weakness, reflex absence, or decrease sensation were reported.
The claimant has not participated in the treatment normally
associated with a severe pain syndrome, i.e., takes pain medication
but hasn't had TENS, physical therapy, pain management
specialist, etc. He betrayed no evidence of more than very mild
pain or discomfort while testifying at the hearing [giving this
factor, however, only slight weight] .

Tr. 23.

The ALJ also noted that the "type, dosage, and side effects of medication employed to treat his

impairment would not preclude him from performing work at the above stated residual functional

1  capacity level, id., although no authority is cited for these medical statements.  The ALJ gave

2  significant weight to the fact that apparently plaintiff often rides a bike.

3          In the undersigned's view, the ALJ left out the most significant fact disputing

4  plaintiff's allegations of alleged symptoms – the plaintiff goes out to look for work *every week –*

5  *and indeed, even the week before the hearing*, such as the testified-to application at Barnes and

6  Nobles  Tr. 41-42.[9]  Such activity is totally inconsistent with plaintiff's later stated view (upon

7  questioning by his attorney who had also noted this statement) that his ailments precluded even

8  part-time work.  Tr. 47.  While it is possible that a person could be looking for work against

9  impossible physical/mental odds, simply because a person has that type of work ethic and

10 unrealistically refused to accede to any limitations, a quixotic, never give-up mentality, the

11 record does not reflect such after plaintiff stopped working in 2004.  Nor did he testify that his

12 employment aspirations were unrealistic as being beyond his physical/mental capabilities.  Nor

13 did he mention that he was seeking sheltered employment, or employment with very minimal

14 working hours.  In this case, if plaintiff really felt his limitations were real, such as lying down

15 three times a day for indefinite periods, being unable to stand and sit for more than four hours a

16 day, and that such precluded work, including the residual functional capacity which would allow

17 even part-time work (four or so hours a day), his testified-to limitations are entirely inconsistent

18 with how he actually felt and what he actually did.  This is so whether his alleged limitations

19 stem from physical or mental problems or both.[10]

20

---

21      [9] Q. [ALJ] Okay. When, when was the last time you seriously went out and tried to find a
    job?
22  A. Last week, Barnes and Noble.
    Q. And what happened?
23  A. I picked up an application and haven't turned it in yet.
    Q. Okay.  And how often do you look for a job.
24  A. Every week.

25      [10] Nor does any evidence exist that plaintiff's job seeking activities were undertaken
    simply because plaintiff was bored.   Nor is this a situation where plaintiff looked for work on
26  only the most sporadic of occasions; rather it was every week.

1       While the ALJ's analysis focusing on items that may or may not be relevant to

2   plaintiff's condition, e.g., atrophy, or may require treatment that was not efficacious for

3   plaintiff's condition, e.g., TENS, and came perilously close to simply a long winded way of

4   saying that one's objective medical manifestations don't correlate with the amount of pain

5   alleged, the court cannot overlook plaintiff's explicit admission, and acted-upon belief, that he

6   can perform work.

7       With respect to third party testimony, the ALJ rejected the statements of plaintiff's

8   friend, Mr. Powers.  The sole basis upon which this detailed statement was rejected was that

9   although consistent with plaintiff's testimony (absent consideration of continuous work

10  applications), since plaintiff's testimony had been rejected, so too would Mr. Power's statement.

11  Tr. 23.  The undersigned has doubts that third-party testimony can be so easily rejected,

12  especially if it contains new facts not expressly testified-to by plaintiff, but that quandary need

13  not be resolved here in that if plaintiff's credibility is devastated by his employment seeking

14  activities, and it is, so too would be Mr. Powers' who either knew about this and did not express

15  it, or was altogether unaware that plaintiff was not as disabled as he had observed or heard about

16  from plaintiff.[11]

17      In sum, plaintiff's and Mr. Powers' credibility were appropriately rejected in the

18  sense that plaintiff's testified-to limitations were not "fully credible."  In so finding, the

19  undersigned again recognizes that plaintiff had serious back problems in the past, from which he

20  recovered when he was again re-injured while teaching, and that plaintiff had encountered some

21  mental difficulties especially in the recent past.  The undersigned has not found that plaintiff's

22  long term treatment and pain were a fabrication.  The undersigned is finding that seriously

23  looking for work every week is inconsistent with testimony which would preclude one from

24  _____

25      [11] Plaintiff also referenced a statement from the Social Security claim representative that
    plaintiff appeared stiff and in pain when he left the representative's desk.  However, this
    statement begs the issue of to what degree this stiffness/pain would preclude sitting and standing

26  at work.  The ALJ was not required to discuss this one-time observation.

1   working at all.

2       E.  Whether the ALJ Relied on the Vocational Expert (VE) Response to an Improperly

3   Formulated Hypothetical

4          A hypothetical posed to a vocational expert must be based on substantial evidence

5   in the record.  Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).  In this case, the

6   hypothetical upon which the ALJ based his decision was in turn based on the SA physician who

7   opined that plaintiff could engage in six hours standing and six hours sitting.   The VE was able

8   to identify jobs with this hypothetical. Tr. 58-61.  Plaintiff's hypothetical posed by his counsel

9   was based on Dr. Neuschatz' opinion concerning a combined limitation to four hours sitting and

10  standing.  Tr. 64-65.  However, the hypothetical also included plaintiff's self-reported limitation

11  of having to lie down three times during a work day, a limitation that the ALJ implicitly rejected

12  for credibility reasons.

13         If the issue here was simply a contest between the hypotheticals based on the two

14  physician's assessments, plaintiff would prevail as the court has already found that the Neuschatz

15  assessment trumps that of the SA physician.  However, because the hypothetical was based, in

16  part, on the legitimately rejected lying down limitation, there is no way that the undersigned can

17  know what the VE would opine if that particular limitation were eliminated.  The case must be

18  remanded for that purpose.[12]

19      F.  Whether the Jobs Which the VE Identified as Being Able to Be Performed by Plaintiff

20  Were Consistent with the Dictionary of Occupational Titles

21         Plaintiff makes the allegation, rejected in the past by the undersigned, that the

22  limitation of being able to perform more than simple "one and two step tasks" is inconsistent

23  with the DOT description of the jobs identified by the VE that were described as "reasoning

24

25      [12] Again, although the lying down limitation was included in Dr. Neuschatz' residual
    functional capacity assessment, it was entirely based on plaintiff's self-reporting; it had never
26  been prescribed or noted in the medical records prior to that time.

1   levels 3 and 4.

2           It is tempting to just substitute the language in the hypothetical with the precise

3   language in the DOT, but fashioning a decision on simplicity alone here would turn out to be

4   wrong.  Rather than adhere to a strict construction of what this limitation equates to in terms of

5   reasoning level, this court prefers to follow the well developed reasoning of the Central District

6   in Meissl v. Barnhart, 403 F. Supp.2d 981 (C.D. Cal. 2005).  There, the plaintiff was found to be

7   limited to "simple tasks performed at a routine or repetitive pace."  Id. at 982.  The court

8   explained that although the Social Security Regulations contained only two categories of abilities

9   in regard to understanding and remembering instructions, either "short and simple" and

10  "detailed" or "complex," the DOT had many more gradations for measuring this ability, and

11  there were six gradations altogether.  Id. at 984.  For example, level 2 requires application of

12  "commonsense understanding to carry out detailed but uninvolved written or oral instructions.

13  Deal with problems involving a few concrete variables in or from standardized situations."

14  DICOT, App. C.  The court continued:

15              To equate the Social Security regulations use of the term "simple"
                with its use in the DOT would necessarily mean that all jobs with a
16              reasoning level of two or higher are encapsulated within the
                regulations' use of the word "detail."  Such a "blunderbuss"
17              approach is not in keeping with the finely calibrated nature in
                which the DOT measures a job's simplicity.

18

19  Meissl, 403 F. Supp.2d at 984.

20          Furthermore, the use of the term "uninvolved" along with the term "detailed" in

21  the DOT qualifies it and refutes any attempt to equate the Social Security regulations' use of the

22  term "detailed" with the DOT's use of that term.  Id.  The court found that the plaintiff's RFC

23  must be compared with the DOT's reasoning scale.  A reasoning level of one requires slightly

24  less than simple tasks that are in some sense repetitive.  For example, they include the job of

25  counting cows as they come off a truck.  A reasoning level of two would encompass an RFC of

26  being able to do "simple and repetitive work tasks."  Id.  Taking Meissl to the next level would

19

1  lead to the conclusion that a reasoning level of three would therefore include the ability to

2  perform tasks with one or two step instructions, as that term is utilized in Social Security

3  parlance.

4          Nothing in this record suggests that plaintiff, a fairly intelligent man, who has

5  taught school in the recent past, is limited to counting cows as they come off a truck.  Rather, the

6  jobs identified by the VE (cashier, information clerk, retail sales clerk), even from a common

7  sense standpoint, are not beyond one or two step instruction positions.  The VE was certainly

8  aware of this from a point of expertise as well.

9  *Conclusion*

10          For the reasons expressed herein, plaintiff's motion for summary judgment

11  (docket #20) is granted in part, and the Commissioner's cross-motion for summary judgment

12  (docket #21) is denied.  Judgment should be entered for plaintiff pursuant to sentence four of 42

13  U.S.C. 405(g).  The case is remanded to the Commissioner for action not inconsistent with this

14  order.  However, nothing in this order precludes either side from submitting additional, relevant

15  evidence, especially that evidence which post-dates the administrative proceedings in this case.

16  DATED: 01/27/11

17                                              /s/ Gregory G. Hollows

18                                              _____
                                               GREGORY G. HOLLOWS
    GGH:gh:035                                 UNITED STATES MAGISTRATE JUDGE

19  jenkins1084.ss

20

21

22

23

24

25

26

                                              20